**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 23-1288

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

ARTHUR T. STOVER; GIGI STOVER,

Defendants – Appellants.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Robert J. Conrad, Jr., District Judge. (3:20-cv-00579-RJC-DCK)

Argued: January 29, 2025                    Decided: March 12, 2025

Before AGEE and RICHARDSON, Circuit Judges, and Michael S. NACHMANOFF, United States District Judge for the Eastern District of Virginia, sitting by designation.

Vacated and remanded by published opinion. Judge Agee wrote the opinion, in which Judge Richardson and Judge Nachmanoff joined.

**ARGUED:** Douglas Everette Kingsbery, THARRINGTON SMITH LLP, Raleigh, North Carolina, for Appellants. Julie Ciamporcero Avetta, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** David A. Hubbert, Deputy Assistant Attorney General, Michael J. Haungs, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Dena J. King, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

AGEE, Circuit Judge:

In late 2008, the IRS assessed Arthur and Gigi Stover a six-figure tax bill the married couple could not pay. The Government waited to initiate a collection suit to recover the unpaid taxes until 2020, almost a full twelve years later.

That delay would usually be too long—the Government generally has ten years after assessment of a tax liability to sue a delinquent taxpayer to collect unpaid taxes. 26 U.S.C. § 6502(a)(1); *see United States v. Galletti*, 541 U.S. 114, 119 (2004). The collection window is expanded, however, when the taxpayer offers to pay down their debt in installments—for the entire time such a request is pending. 26 U.S.C. §§ 6503(a)(1), 6331(i)(5), 6331(k)(2)(A); *cf. United States v. Witkemper*, 27 F.4th 551, 554 (7th Cir. 2022). Here, the Government claims their suit was timely because the collection period was tolled just long enough, starting from the time the Stovers are alleged to have requested an installment agreement to pay off their debt in 2008. An IRS automated record supports the Government's position, indicating that the Stovers made such a request on December 12, 2008. But Arthur Stover's sworn testimony is to the contrary: the couple first contacted the IRS about a payment plan through their Certified Public Accountant ("CPA") in 2009. If the latter is accurate, then the IRS suit would be time barred.

This appeal comes down to a straightforward question of civil procedure: is summary judgment proper when two pieces of admissible evidence in the record conflict as to the date that dictates the timeliness of a suit? We think not, so we vacate the district court's grant of summary judgment to the Government and remand for further proceedings.

I.

After selling a family business for $1.4 million in 2007 and filing their joint tax return the following year, the IRS assessed the Stovers a significant tax bill on November 24, 2008. The Stovers realized they would not be able to pay that amount in a lump sum and reached out to the IRS to request to pay down their debt in an installment agreement at some point in the ensuing months. The date of that request is decisive as to the timeliness of the instant suit for collection.

According to IRS records,[1] the Stovers' "request for installment agreement" came on December 12, 2008. J.A. 51; *see also* J.A. 36 (listing a "Pending installment agreement" on the same date). The IRS documents in the record on appeal do not reveal how that request was made or provide any more details about how it came to appear in their records. Nevertheless, when the IRS transferred the Stovers' case from the Automated Collection System to a live agent in July 2009, the agent noted that the record reflected the Stovers had requested an installment agreement at some point in the preceding months.

But in a deposition taken by the Government, Arthur Stover refuted that such a request was made in 2008. Indeed, he denied ever reaching out to the IRS about a payment plan directly. Instead, his CPA "was going to reach out to the IRS" to "see if there's any

---

[1] These records are the IRS' account transcripts for the Stovers and an IRS Form 4340, which is a "Certificate of Assessments and Payments" associated with their tax history. J.A. 35–36. While there are two different documents in the record saying the same thing, the initial entry that the Stovers requested an installment agreement on December 12, 2008, appears to have been the product of a single entry on the IRS' Automated Collection System.

sort of arrangements that can be made." J.A. 166. That contact, Stover swore, could not have happened until "May, June, or July of '09 because the power of attorney was signed in . . . I think June or July that year." J.A.168. Though the timing is slightly off, IRS records also show no CPA could have made contact on the Stovers' behalf until 2009, as those records indicate that the Stovers "appointed [a] representative" on February 10, 2009, and the IRS received their Power of Attorney and Tax Information Authorization for the CPA on the same date. J.A. 36, 52.

More than a decade after its tax assessment, the Government came knocking when it filed suit against the Stovers to collect the 2007 unpaid tax liability.[2] After conducting discovery, the Government moved for summary judgment. At all times throughout the proceedings, the Stovers have conceded they never paid their 2007 taxes, but assert the Government waited too long to collect. The Government, however, maintains that their ten-year collection period was tolled just long enough to render their collection suit timely. The Government's motion for summary judgment therefore turned on whether the Stovers' request for an installment agreement sufficiently tolled the Government's collection period.

Without any tolling, the Government's collection suit would have had to have been filed by November 24, 2018. *See* 26 U.S.C. § 6502(a)(1). If the installment agreement request came on December 12, 2008, as the Government claims, that date was tolled for

---

[2] The Government also sued to recover more recent—and unquestionably timely—tax debts. But because the scope of this appeal concerns only the timeliness of the suit as it relates to the Stovers' 2007 tax liability, we limit our discussion to that part of the suit.

4

703 days, thus extending the statute of limitations until October 27, 2020. The Government filed this suit on October 20, 2020. So, if the Stovers requested the installment agreement on December 12, 2008, the suit would be timely with one week to spare. But if that request came sometime in 2009—i.e., more than a week after December 12, 2008—it follows that the statute of limitations would not have been tolled long enough to make collection of the 2007 liability timely.

Finding "no genuine issue of material fact as to whether the Stovers requested an installment agreement on December 12, 2008," the district court held "that request tolled the statute of limitations, and the [IRS]' eventual collection action was timely filed," and so it granted the Government summary judgment. *United States v. Stover*, No. 3:20-cv-579, 2023 WL 2088185, at *1 (W.D.N.C. Feb. 17, 2023). This appeal followed, and we have jurisdiction under 28 U.S.C. § 1291.

## II.

We review the district court's grant of summary judgment de novo, applying Rule 56's familiar standards to determine whether summary judgment should have been awarded in the first place. *See We CBD, LLC v. Planet Nine Priv. Air, LLC*, 109 F.4th 295, 301 (4th Cir. 2024). To that end, summary judgment is proper if—after viewing the evidence in the light most favorable to the nonmoving party and making justifiable inferences in their favor, *Bennett v. Garner*, 913 F.3d 436, 438 (4th Cir. 2019)—the moving party "shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a); *see, e.g.*, 10B Charles Alan Wright &

5

Arthur D. Miller, *Federal Practice & Procedure* § 2739 (4th ed. 2024) (observing that "[t]he burden does not shift to the opposing party" "if the movant fails to meet the burden of showing the absence of any genuine issue of material fact").

### III.

The parties agree summary judgment turns on whether the record presents a genuine issue of fact as to whether the Stovers requested an installment agreement on December 12, 2008. Because that date bears on the suit's timeliness, materiality of that fact is not at issue.[3] *Cf. United States v. 8.929 Acres of Land in Arlington Cnty.*, 36 F.4th 240, 252 (4th Cir. 2022) (explaining that a fact dispute is material if it could affect the outcome of a case under the governing substantive law). Our only task here is to determine whether the December 12, 2008 date is subject to a genuine dispute "based on our independent review of the entire record." *Bellon v. PPG Emp. Life & Other Benefits Plan*, 41 F.4th 244, 251 (4th Cir. 2022) (quoting *Trs. of the Plumbers & Pipefitters Nat'l Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 446 (4th Cir. 2015)).

We need look no further than Arthur Stover's deposition to find such a genuine dispute of fact. His testimony in the Government's deposition was that only the Stovers'

---

[3] Indeed, the Stovers concede summary judgment would be proper if that date were established as factually correct. *See* Opening Br. 6. The Government does not appear to concede the same—at least explicitly—but neither do they argue materiality of this fact. *Accord* Resp. Br. 15 (arguing that their suit was timely because it came a week before the running of the tolled statute of limitations, assuming tolling began on December 12, 2008).

CPA contacted the IRS about paying down the couple's debt in an installment agreement. According to Stover, that contact was not made until sometime in 2009.

Stover's relevant testimony—which we note came during the Government's direct examination—establishing the question of fact is below:

Q. Okay. So you knew in 2008 that you had a $160,000 tax bill coming?

A. Yes.

Q. Okay. When that happened, did you make any plans for it?

A. Well, we made an appointment with my CPA, and somewhere through that process in the first quarter to the middle of the year of 2009, we . . . brought them on board with the power of attorney in that middle of 2009.

Q. What did you expect them to do . . . . What advice did you get?

A. Well, what advice? In 2009, he rolled out what his plan was. He was going to reach out to the IRS and make contact and find out what our options are. Really at that point, we knew we couldn't pay it lump sum, you know, so we were depending on him. I'm not sure what I was expecting.

Q. You said you knew you couldn't pay it lump sum?

A. Yes. In 2009 with the way things were going, it wasn't going to happen, and that's when we went to [our CPA] and said, "Listen, we need some – we need to get you to help us and reach out." It's very stressful, of course. . . .

Q. Did you ever discuss paying the taxes over a series of smaller payments?

A. I don't believe so.

Q. So you hired [your CPA]. What did you – so I'm just confused. . . . [D]id they tell you what they were going to do?

A. Yeah. Yeah. They were going to reach out to the IRS, see if there's any sort of arrangements that can be made – a pay schedule. And that's kind of where we let them go and said, "Yes. See what you can do. See what our options are."

7

. . . .

Q. Earlier I asked whether you had discussed with [your CPA] a series of smaller payments over time to resolve your tax liability, correct?

A. No. I was referring to when I said that we were talking about some sort of – whatever options. I don't even know at that time if I even knew a pay period or pay schedule or anything. Honestly I was just – what does a tax payer do when he's like this? That's the advice I was looking for . . . wise counsel.

Q. Gotcha. And he . . . advised you of some sort of payment plan over time?

A. Yeah. . . .

Q. Okay. What date did that conversation happen?

A. Well, it had to be in like, May, June, or July of '09 because the power of attorney was signed in, like, I think June or July that year.

Q. How do you figure that?

A. How do I figure that that's – because that would have been the time that we were talking about the debt. That would have been 2009. The first quarter and the first half of the year is when we had the realization, I guess would be a way to say it, that we weren't going to make this happen. It wasn't going to work. So we sat down with [our CPA] and told him our pickle, and then over a handful of meetings we came up with a plan.

. . .

Q. Why did you wait so long to talk to [your CPA] about it?

A. I think at the time, you know, Christmas of that year, we were still thinking that we were going to be okay. We were just – and I'm going from memory here. We were just thinking the market was going to turn because it was pretty volatile and it was going up and down. And then right in the first quarter I think is when, if my memory is right, that everything tanked big time. I think that was the punch in the gut for us and when we reached out in earnest to [the CPA] to hire him then.

J.A. 164–70.

8

Arthur Stover was never asked directly whether he contacted the IRS on December 12, 2008. But his sworn testimony—based on his personal knowledge and memory—nonetheless contradicts the Government's version of events. According to his testimony, the Stovers had no occasion to think about alternate payment options until early 2009, when they hired their CPA, who told them for the first time about the installment agreement option. To be sure, the Stovers' version of events may be "far from ironclad, and a reasonable factfinder might decline to believe it." *Alexander v. Connor*, 105 F.4th 174, 178 (4th Cir. 2024). But so too could a factfinder reasonably infer from the deposition testimony that the IRS' date must be wrong because the Stovers did not even *know* an installment agreement was a possibility until 2009. Because the Court cannot usurp a factfinder's prerogative in deciding which evidence-backed version is more credible, *see id.*, we conclude the deposition presents a genuine issue of fact as to the date of the installment agreement.

The Government criticizes this reading of Arthur Stover's deposition testimony because it is "generous." Resp. Br. 28. That's not a criticism so much as an accurate statement of the law as to how we are supposed to construe evidence when assessing the propriety of summary judgment. *See Strickland v. City of Detroit*, 995 F.3d 495, 513 (6th Cir. 2021) (recognizing that it "is appropriate on a motion for summary judgment" to read deposition testimony in the manner "most generous" to the nonmoving party); *cf. Johnson v. Robinette*, 105 F.4th 99, 109 (4th Cir. 2024).

We fully agree with the Government that the direct testimony it took in Stover's deposition is not a picture of clarity—imprecise questions beget unclear answers. But at

this stage, a plausible read of Arthur Stover's testimony puts into dispute whether the Stovers requested an installment agreement on December 12, 2008. To be sure, this endeavor would have been far simpler if the Stovers presented an affidavit swearing they had not contacted the IRS in 2008 about an installment agreement.[4] *See, e.g.*, *United States v. Nugent*, 300 F. Supp. 3d 932, 944 (E.D. Ky. 2018). Nevertheless, it is fair to say that Arthur Stover's deposition testimony created a genuine dispute of fact regarding whether the Stovers requested an installment agreement in 2008. Summary judgment was therefore improper.[5]

---

[4] To our surprise at oral argument, counsel informed us for the first time that the Stovers had, in fact, submitted affidavits to that effect. *See* District Court ECF Nos. 35-2 ("With regard to the 2007 tax year and the 2007 Tax Liability, I never called or contracted [*sic*] the IRS . . . in 2008 concerning a proposed installment plan, and moreover, never authorized any agent to contact the IRS or its agents in 2008."); 35-3 (same statement from Gigi Stover). But to our further surprise, these sworn statements were attached to a motion for sanctions, which the Stovers withdrew three weeks before the district court held a hearing on the Government's summary judgment motion. Therefore, the district court did not have occasion to consider them, nor do we.

[5] The district court erred by failing to address the representations by Arthur Stover in his deposition as to the timing of events. But we do not entirely blame the district court, as the Stovers' single citation to the deposition in the fact section of their brief opposing summary judgment did little to highlight the factual dispute. *See* J.A. 173 (pointing to the deposition to support their factual recitation that they "did not contact the IRS concerning a payment plan . . . until 2009"). Nevertheless, the Stovers adequately highlighted that part of the record to put the district court on notice of the fact dispute. Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions . . . ."); *cf. Higgenbotham v. Ochsner Found. Hosp.*, 607 F.2d 653, 656–67 (5th Cir. 1979) (stating under a previous version of Rule 56 that a district court should have considered a deposition even though it was not "singled out by counsel for special attention" where "the deposition that created the dispute" was not "a needle in a paper haystack").

As a final argument in favor of summary judgment, the Government asks us to give dispositive credit to its characterization of the record by virtue of the IRS' role as a government entity. It cites the presumptions of correctness and regularity to bolster their argument that we ignore the Stovers' evidence in complete favor of their own. In other words, the IRS contends its transcript entries—under either a presumption of correctness or a presumption of regularity—are conclusive at summary judgment as a matter of law.

Regardless of whether either burden-shifting presumption were to apply to an automated entry in the determination of the merits—a question we save for another day— it is inappropriate at summary judgment to ignore the fact dispute created by Arthur Stover's deposition testimony. While it's true that the Court "must view the evidence presented through the prism of the substantive evidentiary burden," we "grant summary judgment *only* when 'there is no genuine dispute as to any material fact.'" *United States v. McClellan*, 44 F.4th 200, 205 (4th Cir. 2022) (first quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986); and then quoting Fed. R. Civ. P. 56(a)) (emphasis added). And the moving party may carry its initial burden on summary judgment only if it can show "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). By virtue of Arthur Stover's deposition, the Government can show neither the absence of a genuine dispute of fact or a dearth of evidence to support the Stovers' position. *See Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) ("Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial

11

burden of demonstrating the absence of a genuine issue of material fact." (citing *Celotex*, 477 U.S. at 323)).

## IV.

One piece of evidence says the Stovers requested an installment agreement on December 12, 2008, while another supports an inference that they could not have done so until 2009. That fact dispute bears directly on the only dispositive issue in this case— whether the Government's attempt to collect the 2007 tax liability was timely—so summary judgment should not have been awarded. Accordingly, we vacate the district court's award of summary judgment and remand for further proceedings consistent with this opinion.

*VACATED AND REMANDED*